BENJAMIN A. EMMERT, Bar No. 212157
LITTLER MENDELSON
A Professional Corporation
50 West San Fernando Street
7th Floor
San Jose, CA  95113.2303
Telephone:     408.998.4150
Fax No.:        408.288.5686

Attorneys for Plaintiff
CHARGEPOINT, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CHARGEPOINT, INC., a Delaware corporation, | Case No. |
| Plaintiff, | **COMPLAINT FOR INJUNCTIVE RELIEF** |
| v. | |
| OVERTON CLABORNE, an individual; OVERTON INSTRUMENTS, a business organization, form unknown, and DOES 1 through 100 inclusive, | |
| Defendants. | |

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA  95113.2303
408.998.4150

Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

Plaintiff ChargePoint, Inc. ("ChargePoint" or the "Company") for its Complaint ("Complaint") alleges as follows:

### THE PARTIES

1. At all relevant times, ChargePoint was, and is a Delaware corporation and is authorized to conduct business in California.

2. Upon information and belief, at all relevant times, Defendant Overton Claborne ("Claborne") is an individual residing in Martinez, California. Defendant Claborne is sued in his capacity as an individual and as an agent of Defendant Overton Instruments.

3. At all relevant times, Defendant Overton Instruments is a business organization form unknown and has a principal place of business in Milpitas, California, the County of Santa Clara, California. (Defendants Claborne and Overton Instruments are hereinafter collectively referred to as "Defendants.")

4. ChargePoint is informed and believes and thereon alleges that at all times mentioned in this Complaint, in committing the wrongful acts alleged herein, Defendants have pursued, or joined in the pursuit of, a common course of conduct and acted in concert with and conspired with one another, in furtherance of their common plan or scheme. ChargePoint is informed and believes and thereon alleges that at all times mentioned in this Complaint, in addition to the wrongful conduct alleged herein as giving rise to primary liability, Defendants also aided and abetted each other in committing the wrongful acts alleged herein.

5. ChargePoint is informed and believes and thereon alleges that at all times mentioned in this Complaint, Defendants, and each of them, were the partners, engaging in a joint venture, agents, employees, alter egos, and representatives of each other in doing the things herein alleged and, in doing so, were acting within the scope of their respective authorities as agents, employees and representatives, and are jointly and severally liable to ChargePoint.

6. ChargePoint does not know the true names and capacities, whether individual, corporate, associate, or otherwise of Defendants DOES 1 through 100, inclusive. Such fictitious defendants are sued pursuant to the provisions of section 474 of the California Code of Civil Procedure. ChargePoint is informed and believes and upon such information and belief alleges that

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

2.                    Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

1   each fictitious defendant was in some way responsible for, participated in or contributed to the matters

2   and things of which ChargePoint complains herein, and in some fashion, has legal responsibility,

3   therefore.  When the exact nature and identity of the fictitious Defendants who are responsible for

4   participating and contributing to the matters and things herein alleged are ascertained by ChargePoint,

5   it will seek leave to amend this Complaint to set forth the same.

6   **JURISDICTION AND VENUE**

7   7.    This Court has original jurisdiction of this action pursuant to the Defend Trade

8   secrets Act, 18 U.S.C. § 1836(c) and 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over

9   the other claims asserted herein pursuant to 28 U.S.C. § 1367.

10   8.    Venue is proper in this District because the Parties have contractual agreements

11   providing that Venue is proper in this Court.  Venue is proper in this District pursuant to 28 U.S.C. §

12   1391(b) and N.D. Cal. L.R. 3.2(c) because a substantial part of the events or omissions giving rise to

13   the claims herein arose in this District.

14   **GENERAL ALLEGATIONS**

15   **CHARGEPOINT, INC.**

16   9.    ChargePoint is one of the world's largest operators of electric vehicle (EV)

17   charging station networks in North America and Europe.  As such, ChargePoint brings electric vehicle

18   charging to more people and places than ever before.

19   10.   ChargePoint designs, builds, and supports all the technology powering its

20   network, from charging station hardware to energy management software solutions to a world-class

21   mobile app.

22   **CHARGEPOINT, INC.'S CONFIDENTIAL INFORMATION**

23   11.   Over the years, and as a result of its investment of significant time, money, and

24   other resources, ChargePoint has acquired and developed certain valuable information that it classifies

25   as confidential, proprietary, and/or trade secret, including, *inter alia*, detailed designs, schematics, and

26   specifications for new and existing components used in its products and services.  Moreover, in an

27   effort to continually improve its products and services, ChargePoint continues to research and develop

28   components and systems to upgrade its existing and new systems.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

3.                    Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

12.     One such component ChargePoint has been developing is a new blind mate connector (the "Blind Mate Connector.")   A blind mate connector differs from other electrical connectors in that it has a sliding self-aligning feature that allows for small misalignment when the male portion of the connector is attached to the female portion.

13.     ChargePoint has expended significant time and resources designing, developing, manufacturing, and testing the Blind Mate Connector.  Moreover, because the Blind Mate Connector and the related product(s) in which it is to be used are still in the development phase, ChargePoint will continue to expend significant time and resources to complete testing and developing the final product.

14.     ChargePoint's Blind Mate Connector is a unique proprietary design that is not known or used by ChargePoint's competitors.   ChargePoint has not disclosed the Blind Mate Connector's design or specifications to any individual or entity absent that individual or entity entering into a non-disclosure agreement preventing that individual or entity from using the information for any purpose not authorized by ChargePoint.  ChargePoint considers information regarding the Blind Mate Connector one of its confidential, proprietary and trade secrets.

## CHARGEPOINT, INC. PROTECTS ITS CONFIDENTIAL INFORMATION

15.     ChargePoint takes significant legal and technical measures to guard and protect its confidential, proprietary and trade secret information, including information regarding the Blind Mate Connector, from theft, misappropriation, and other unauthorized disclosures and/or uses.  These measures include, but are not limited to, requiring its employees and consultants to sign and agree to abide by confidentiality and non-disclosure agreements called "Employee Proprietary Information And Inventions Agreement" (the "Confidentiality Agreement"), password protection for access to its computers and computer networks, and limiting access to its confidential, proprietary, and/or trade secret information to those who have a legitimate need to know such information.  A true and correct copy of ChargePoint's Confidentiality Agreement is attached hereto as Exhibit A.

16.     ChargePoint's Confidentiality Agreement, states, in pertinent part:

//

//

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA  95113.2303
408.998.4150

4.                                      Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

II.   Definitions.

A.   **"Confidential Information"** shall mean information or material (i) that is proprietary to Company or considered confidential by Company, whether or not designated or labeled as such, and (ii) that Employee creates, discovers or develops in whole or in part, or of which Employee obtains knowledge of or access to in the course of Employee's relationship with Company. Confidential Information may include, but is not limited to, designs, works of authorship, formulae, ideas, concepts, techniques, inventions, devices, improvements, know-how, methods, processes, drawings, specifications, models, data, diagrams, flow charts, research, procedures, computer programs, marketing techniques and materials, business, marketing, development and product plans, financial information, customer lists and contact information, personnel information, and other confidential business or technical information. For purposes of this Section 2, "Company" shall mean Company or any of its affiliates. INFORMATION THAT IS OR BECOMES PUBLICLY KNOWN WITHOUT FAULT ON EMPLOYEE'S PART SHALL NOT BE SUBJECT TO THE CONFIDENTIALITY OBLIGATIONS SET FORTH IN THIS AGREEMENT.

. . .

III.   Confidentiality.

During the term of Employee's employment by Company and at all times thereafter, Employee will keep in strict confidence and trust all Confidential Information, and Employee will not, directly or indirectly, disclose, distribute, sell, transfer, use, lecture upon or publish any Confidential Information without the written consent of Company, except as may be necessary in the ordinary course of performing Employee's duties as an employee of Company.

. . .

IV.   Company Property. All apparatus, computers, computer files and media, notes, data, documents, reference materials, sketches, memoranda, records, drawings, engineering log books, equipment, lab/inventor notebooks, programs, prototypes, samples, equipment, tangible embodiments of information, and other physical property, whether or not pertaining to Confidential Information, furnished to Employee or produced by Employee or others in connection with Employee's employment, shall be and remain the sole property of Company and shall be returned promptly to Company as and when requested by Company. Should Company not so request, Employee shall return and deliver all such property to Company upon termination of Employee's employment. Employee may not retain any such property or any reproduction of such property upon such termination. Employee further agrees that any property situated on Company's premises and owned, leased, maintained or otherwise contracted for by Company, including, but not limited to, computers, computer files, e-mail, voicemail, disks and other electronic storage media, filing cabinets, desks or other work areas, are subject to inspection by Company's representatives at any time with or without notice.

. . .

Case No. _____

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

X.   <u>Injunctive Relief</u>. Because of the unique nature of the Confidential Information and the Company Work Product, Employee understands and agrees that Company will suffer immediate and irreparable harm if Employee fails to comply with any of his or her obligations under this Agreement and that monetary damages will be inadequate to compensate Company for such breach. Accordingly, Employee agrees that in the event of a breach or threatened breach of this Agreement, in addition to any other remedies available to it at law or in equity, Company will be entitled, without posting bond or other security, to injunctive relief to enforce the terms of this Agreement, including, but not limited to, restraining Employee from violating this Agreement or compelling Employee to cease and desist all unauthorized use and disclosure of the Confidential Information and Company Work Product. Employee will indemnify Company against any costs, including, but not limited to, reasonable legal fees and costs, incurred in obtaining relief against Employee's breach of this Agreement. Nothing in this section shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including but not limited to recovery of damages.

. . .

XV.   <u>Arbitration and Equitable Relief</u>.

. . .

D.   **AVAILABILITY OF INJUNCTIVE RELIEF**. In addition to the right under the rules to petition the court for provisional relief, each party agrees that any party may also petition the court for injunctive relief where either party alleges or claims a violation of this agreement or any other agreement regarding trade secrets, confidential information, non-solicitation of employees or Labor Code §2870. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

A true and correct copy of ChargePoint's Confidentiality Agreement is attached hereto as Exhibit A.

17.   ChargePoint also requires its vendors to agree to and be bound by a Mutual Nondisclosure Agreement ("NDA"). ChargePoint's NDA states, in pertinent part:

**1.   Confidential Information.** "Confidential Information " means confidential or proprietary information disclosed or made available by one Party to the other, including but not limited to, business plans, financial reports, financial data, employee data, customer lists, designs, specifications, drawings, diagrams, computer code and programs, trade secrets, discoveries, ideas, concepts, know-bow, techniques, and other technical and business information. Confidential Information may be that of the disclosing Party or of third parties to whom the disclosing Party has an obligation to treat the disclosed information as confidential. Confidential Information also includes copies, notes, abstracts and other tangible embodiments made by the receiving Party that are based on or contain any of such information, as well as the existence and progress of the Purpose (described in Section 4 below).

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

Case No. _____

. . .

3.    **Protection of Confidential Information.** Each Party acknowledges that the other Party claims that its Confidential Information is a valuable and unique asset and agrees to the following: (a) The receiving Party: (i) will not disclose the Confidential Information to any third Party; (ii) will not disclose the Confidential Information to its employees or agents unless the employees or agents have a need to know the Confidential Information for the Purpose; (iii) will use the Confidential Information only for the Purpose and will not use it for its own or for any third Party's benefit; and (iv) will not create any type of derivative works based on the Confidential Information, copy, frame, replicate or mirror any part or content of the Confidential Information, or reverse engineer any of the Confidential Information or products received or disclosed during the Effective Date. The receiving Party may not access or use the Confidential Information for any improper purposes whatsoever, including, without limitation, in order to (A) build a competitive product or service, or (B) copy any features, functions, interface, graphics or "look and feel" of the disclosing Party's product or Confidential Information. The receiving Party shall promptly notify the disclosing Party of any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of the disclosing Party's Confidential Information of which the receiving Party becomes aware. The receiving Party shall be responsible to the disclosing Party for any disclosure of Confidential Information by any employee or agent of the receiving Party.

. . .

**5.    Return of Confidential Information.** All Confidential Information of the disclosing Party remains the property of that Party and will be returned to it or destroyed at its request or upon the termination or other expiration of this Agreement.  Within 30 days of receiving such a request from the disclosing Party, the receiving Party will comply with the request and provide a written certification, signed by an officer, of its compliance. Notwithstanding the foregoing, Parties are not required to delete copies that are maintained pursuant to automatic back-up and archiving systems provided that confidential obligations shall remain on those archived copies.

A true and correct copy of ChargePoint's NDA is attached hereto as Exhibit B.

## DEFENDANTS OVERTON CLABORNE AND OVERTON INSTRUMENTS

18.    Defendant Overton Claborne worked for ChargePoint as a consultant from about June 16, 2020, to about July 16, 2021.  As a condition of his performing consulting work for ChargePoint, Defendant Claborne signed and agreed to be bound by ChargePoint's Confidentiality Agreement.  A true and correct copy of Defendant Claborne's Confidentiality Agreement is attached hereto as Exhibit A.

19.    ChargePoint granted Defendant Claborne restricted access to its confidential, proprietary, and/or trade secret information for the purpose of Defendant Claborne performing his

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA  95113.2303
408.998.4150

7.

Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

necessary and authorized consulting duties for ChargePoint.  He was not authorized to use ChargePoint's protected information for any other purpose whatsoever.  He was also not authorized to retain ChargePoint's information on the termination of his consulting services.

20.     The Confidentiality Agreement also prohibited Defendant Claborne from using ChargePoint's confidential, proprietary, and/or trade secret information for any reason not authorized by ChargePoint.  ChargePoint never authorized Defendant Claborne to access, possess, or use any information regarding the Blind Mate Connector for any purpose whatsoever.

21.     ChargePoint is informed and believes and on that basis alleges that Defendant Claborne is the owner/manager of Defendant Overton Instruments.  Overton Instruments was one of ChargePoint's authorized vendors.  In connection with becoming an authorized ChargePoint vendor, Overton Instruments, by its owner/manager Defendant Claborne, signed and agreed to be bound by ChargePoint's NDA.  A true and correct copy of Overton Instruments' NDA is attached hereto as Exhibit B.

22.     The NDA prohibited Overton Instruments from using ChargePoint's confidential, proprietary, and/or trade secret information for any reason not authorized by ChargePoint.  ChargePoint never authorized Overton Instruments to access, possess, or use any information regarding the Blind Mate Connector for any purpose whatsoever.

## CHARGEPOINT TERMINATES DEFENDANT CLABORNE'S CONSULTING ASSIGNMENT

23.     ChargePoint terminated Defendant Claborne's consulting agreement on about July 16, 2021.  Defendant Claborne performed no services for ChargePoint after this date.  Defendant Claborne was not authorized to access, use, or possess any of ChargePoint's protected information after July 16, 2021.

24.     On or about July 16, 2021, ChargePoint sent Defendant Claborne a confirmation notification that his consulting services had been terminated.  The confirmation included a Termination Certification through which ChargePoint reminded Defendant Claborne of his obligation to keep ChargePoint's protected information confidential as required by his Confidentiality Agreement.  The Termination Certification also required Defendant Claborne certify that he returned

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA  95113.2303
408.998.4150

8.                        Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

and does not have any of ChargePoint's property in his possession. A true and correct copy of Defendant Claborne's signed Termination Certification is attached hereto as Exhibit C.

25. On August 12, 2021, when Mr. Claborne failed to return the Termination Certification, ChargePoint sent Mr. Claborne a confidentiality obligation reminder letter. The letter again reminded him that he had access to ChargePoint's protected information during his consulting assignment and that he was required to keep all such information completely confidential. ChargePoint also demanded that Mr. Claborne return any and all of ChargePoint's property that he may have in his possession and notified him that his failure to do so would constitute a violation of his Confidentiality Agreement. A true and correct copy of this letter is attached hereto as Exhibit D.

26. Mr. Claborne signed and returned ChargePoint's Termination Certification on August 13, 2021.

### DEFENDANTS MISAPPROPRIATE CHARGEPOINT'S CONFIDENTIAL, PROPRIETARY, AND TRADE SECRET INFORMATION AND BREACH THEIR RESPECTIVE CONFIDENTIALITY AGREEMENT AND NDA

27. On about October 4, 2021, one of ChargePoint's vendors it retained to manufacture the Blind Mate Connector units, C.C.P. Contact Probes ("C.C.P."), contacted ChargePoint and informed it that Defendant Claborne and/or Defendant Overton Instruments sent it an email that included a portion of one of ChargePoint's technical drawings of the Blind Mate Connector. Defendants requested C.C.P. send them certain technical information on the connector.

28. In the email, Defendants stated they were working on the connector in a custom test and measurement application and needed the information to allow them to create a library component for a computer schematic capture program. C.C.P. sent ChargePoint a copy of the email it received from Defendants.

29. On receipt of the email from C.C.P., ChargePoint reviewed ChargePoint's technical drawings for the Blind Mate Connector and determined that the image Defendants sent to C.C.P. in the email sent to C.C.P. by Defendants and/or an individual(s) working on their behalf, was a portion of one of ChargePoint's technical drawings for its Blind Mate Connector. The information contained in this document, as well as the drawing itself, is highly confidential and ChargePoint considers it a trade secret.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

9.

Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

30. ChargePoint has not authorized Defendant Claborne, Defendant Overton Instruments, or anyone else at Overton Instruments or anyone associated with Defendant Claborne or Defendant Overton Instruments, to take this document or any information regarding the Blind Mate Connector, including the image in the email, or any of ChargePoint's other protected information, or use its information for any reason following the end of Defendant Claborne's consulting assignment at ChargePoint.

31. Defendants possession of the document and/or the information regarding the Blind Mate Connector violated Defendant Claborne's Confidentiality Agreement, Defendant Overton Instrument's NDA, as well as Defendant Claborne's representations in his Termination Certification.

32. Defendants use of ChargePoint's information regarding the Blind Mate Connector also violates Defendant Claborne's Confidentiality Agreement, Defendant Overton Instrument's NDA.

**FIRST CAUSE OF ACTION**
**Breach Of Contract**
**(Employee Proprietary Information And Inventions Assignment Agreement)**
**(Against Defendant Claborne and Does 1 to 100)**

33. ChargePoint realleges and incorporates by reference paragraphs 1 through 32 as though fully set forth herein.

34. On about July 7, 2020, ChargePoint and Defendant Claborne entered into the Confidentiality Agreement.

35. The Confidentiality Agreement prohibited Defendant Claborne from, among other items, directly or indirectly, disclosing, distributing, selling, transferring, using, or publishing ChargePoint's confidential, proprietary and/or trade secret information unless authorized to do so by ChargePoint.

36. The Confidentiality Agreement also required Defendant Claborne return and deliver to ChargePoint all of ChargePoint's property, including its confidential, proprietary, and trade secret information on the termination of his consulting assignment and not retain any such information following the termination of his consulting assignment.

//

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

10.

Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

37.     ChargePoint has not authorized Defendant Claborne to access, possess, acquire, retain, disclosure, or use ChargePoint's confidential, proprietary, or trade secret information regarding its Blind Mate Connector and has not authorized Defendant Claborne to access, possess, acquire, retain, disclose or use any of its confidential, proprietary, or trade secret information following the termination of his consulting assignment.

38.     Defendant Claborne breached his Confidentiality Agreement by removing, disclosing, distributing, selling, transferring, using, and/or publishing ChargePoint's confidential, proprietary, and/or trade secret information without ChargePoint's authorization in violation of the Confidentiality Agreement.

39.     Defendant Claborne also breached his Confidentiality Agreement by retaining and not returning to ChargePoint ChargePoint's confidential, proprietary, and/or trade secret information without ChargePoint's authorization on the termination of his consulting assignment.

40.     ChargePoint has performed all, or substantially all, of its significant obligations under the Confidentiality Agreement or was excused from performing its obligations that the Confidentiality Agreement required.

41.     As a proximate result of Defendant Claborne's breaches of his Confidentiality Agreement, ChargePoint has suffered and will continue to suffer substantial damages, the exact amount to be determined at trial.

42.     Defendant Claborne's conduct and breaches described above, will, unless and until enjoined and restrained by an order of this Court, cause great and irreparable injury to ChargePoint's business in that it will enable Defendant Claborne and Defendant Overton Instruments, by and through Defendant Claborne's unlawful actions, to unlawfully and unfairly use ChargePoint's protected information.

43.     ChargePoint has no adequate remedy at law for these injuries because the injuries to ChargePoint's business cannot adequately be compensated through monetary damages. As a result, this Court should compel specific performance of Defendant Claborne's contractual obligations.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

44.     ChargePoint is also entitled to injunctive relief because Defendant Claborne agreed that ChargePoint "will suffer immediate and irreparable harm if [he] fails to comply with any of his . . . obligations under [the Confidentiality Agreement]" and that ChargePoint "will be entitled . . . to injunctive relief to enforce the terms of [the Confidentiality Agreement], including, but not limited to, restraining [him] from violating [the Confidentiality Agreement] or compelling [him] to cease and desist all unauthorized use and disclosure of [ChargePoint's] Confidential Information and Company Work Product."

WHEREFORE, ChargePoint prays for judgment as set forth below.

## SECOND CAUSE OF ACTION
### Breach Of Contract
### (Mutual Nondisclosure Agreement)
### (Against Defendant Overton Instruments and Does 1 to 100)

45.     ChargePoint realleges and incorporates by reference paragraphs 1 through 44 as though fully set forth herein.

46.     On about May 28, 2020, ChargePoint and Defendant Overton Instruments entered into the NDA.

47.     The NDA prohibited Defendant Overton Instruments from, among other items, accessing, disclosing, or using ChargePoint's confidential, proprietary and/or trade secret information unless authorized to do so by ChargePoint.

48.     ChargePoint has not authorized Defendant Overton Instruments to acquire, possess, disclose, or use ChargePoint's confidential, proprietary, or trade secret information, including its protected information regarding the Blind Mate Connector for any purpose whatsoever.

48.     Defendant Overton Instruments breached its NDA by acquiring, accessing, disclosing, or using ChargePoint's confidential, proprietary, and/or trade secret information without ChargePoint's authorization in violation of the NDA.

49.     ChargePoint has performed all, or substantially all, of its significant obligations under the NDA or was excused from performing its obligations that the NDA required.

//

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

50.     Defendant Overton Instruments' conduct and breaches described above, will, unless and until enjoined and restrained by an order of this Court, cause great and irreparable injury to ChargePoint's business in that it will enable Defendant Overton Instruments and Defendant Claborne, by and through Defendant Overton Instruments' unlawful actions, to unfairly and unlawfully use ChargePoint's protected information.

51.     ChargePoint has no adequate remedy at law for these injuries because the injuries to ChargePoint's business cannot adequately be compensated through monetary damages.  As a result, this Court should compel specific performance of Defendant Overton Instruments' contractual obligations.

WHEREFORE, ChargePoint prays for judgment as set forth below.

**THIRD CAUSE OF ACTION**
**Misappropriation Of Trade Secrets - California Uniform Trade Secrets Act –**
**Cal Civ. Code § 3426.1 *et seq.***
**(Against All Defendants)**

52.     ChargePoint realleges and incorporates by reference paragraphs 1 through 51 as though fully set forth herein.

53.     Defendants have misappropriated ChargePoint's trade secret information by acquiring, using, and disclosing ChargePoint's trade secret information in connection with their enterprise.

54.     ChargePoint's trade secret information includes, but is not limited to, information pertaining to ChargePoint's Blind Mate Connector.

55.     This information is a trade secret as defined in California Civil Code section 3426.1(d), and has economic value to ChargePoint in that ChargePoint has expended substantial time, money, and effort in developing said information, which is used in connection with ChargePoint's business.

56.     The trade secret information has economic value to ChargePoint in that such information is not known or used by ChargePoint's competitors.  Furthermore, ChargePoint has taken reasonable measures to maintain the secrecy of said information.

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

13.

Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

57. Defendants have misappropriated the above-described trade secrets by, among other ways, acquiring, disclosing, and/or using said secrets in connection with their own enterprise.

58. As a direct, foreseeable, and proximate result of Defendants' actions, as described above, ChargePoint has been injured in that its protected information is being acquired, disclosed, and/or used without ChargePoint's authorization resulting in a loss of trade secret protection for its confidential information.

59. As a result of Defendants' acts as described herein, which were undertaken willfully and maliciously, ChargePoint has been required to secure the services of a law firm and has incurred and will continue to incur substantial attorneys' fees in connection with this matter. Pursuant to Civil Code section 3426.4, ChargePoint is entitled to an award of reasonable attorneys' fees and costs incurred in this action.

60. Defendants' wrongful conduct in misappropriating ChargePoint's trade secrets as described above, will, unless and until enjoined and restrained by an order of this Court, cause great and irreparable injury to ChargePoint's business in that it will enable Defendants to unlawfully and unfairly use ChargePoint's protected information in connection with their own enterprise and without ChargePoint's authorization. ChargePoint has no adequate remedy at law for these injuries because the damage to ChargePoint's protected information cannot adequately be compensated through monetary damages. Unless enjoined by this Court, Defendants will continue to misappropriate these trade secrets. As a result, ChargePoint is entitled to an injunction prohibiting said conduct pursuant to Civil Code section 3426.2.

WHEREFORE, ChargePoint prays for judgment as set forth below.

## FOURTH CAUSE OF ACTION
### Misappropriation Of Trade Secrets - Defend Trade Secrets Act – 18 U.S.C. § 1836 *et seq.*
### (Against All Defendants)

61. ChargePoint realleges and incorporates by reference paragraphs 1 through 60 as though fully set forth herein.

//

//

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA  95113.2303
408.998.4150

14.

Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

62.     Defendants have misappropriated ChargePoint's trade secret information by acquiring, using, and disclosing ChargePoint's trade secret information in connection with their enterprise.

63.     ChargePoint's trade secret information includes, but is not limited to, information pertaining to ChargePoint's Blind Mate Connector.

64.     This information is a trade secret as defined in 18 U.S.C. § 1839(3), and has economic value to ChargePoint in that ChargePoint has expended substantial time, money, and effort in developing said information, which is used in connection with ChargePoint's business.

65.     The trade secret information has economic value to ChargePoint in that such information is not known or used by ChargePoint's competitors.  Furthermore, ChargePoint has taken reasonable measures to maintain the secrecy of said information.

66.     Defendants have misappropriated the above-described trade secrets by, among other ways, acquiring, disclosing, and/or using said secrets in connection with their own enterprise.

67.     As a direct, foreseeable, and proximate result of Defendants' actions, as described above, ChargePoint has been injured in that its protected information is being acquired, disclosed, and/or used without ChargePoint's authorization resulting in a loss of trade secret protection for its confidential information.

68.     As a result of Defendants' acts as described herein, which were undertaken willfully and maliciously, ChargePoint has been required to secure the services of a law firm and has incurred and will continue to incur substantial attorneys' fees in connection with this matter. ChargePoint is entitled to an award of reasonable attorneys' fees and costs incurred in this action.

69.     Defendants' wrongful conduct in misappropriating ChargePoint's trade secrets as described above, will, unless and until enjoined and restrained by an order of this Court, cause great and irreparable injury to ChargePoint's business in that it will enable Defendants to unlawfully and unfairly use ChargePoint's protected information in connection with their own enterprise and without ChargePoint's authorization.  ChargePoint has no adequate remedy at law for these injuries because the damage to ChargePoint's protected information cannot adequately be compensated through monetary damages.  Unless enjoined by this Court, Defendants will continue to misappropriate these

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

15.                    Case No. _____
COMPLAINT FOR INJUNCTIVE RELIEF

1    trade secrets.  As a result, ChargePoint is entitled to an injunction prohibiting said conduct pursuant

2    to 18 U.S.C. § 1836(b)(3).

3              WHEREFORE, ChargePoint prays for judgment as set forth below.

4                                  **PRAYER FOR RELIEF**

5              WHEREFORE, ChargePoint prays for judgment against Defendants as follows:

6         (1)    For a preliminary and permanent order enjoining Defendants from utilizing

7    ChargePoint's confidential, proprietary and/or trade secret information;

8         (2)    For an order requiring Defendants to return to ChargePoint all of its

9    confidential, proprietary, and trade secret information, and any other property they have converted or

10   misappropriated or otherwise have in their possession, custody, or control that ChargePoint has not

11   authorized them to possess;

12        (3)    For its reasonable attorneys' fees;

13        (4)    For costs of suit incurred herein; and

14        (5)    For such other and further relief, including any statutory relief, as the Court

15   deems just and proper.

16    Dated: October 14, 2021

17

18                                   _____
                                     BENJAMIN A. EMMERT
19                                   LITTLER MENDELSON
                                     A Professional Corporation
20                                   Attorneys for Plaintiff
                                     CHARGEPOINT, INC.

21

22

23   4824-7025-8174.1 / 112172-1000

24

25

26

27

28

LITTLER MENDELSON, P.C.
50 W. San Fernando, 7th Floor
San Jose, CA 95113.2303
408.998.4150

16.

Case No. _____

COMPLAINT FOR INJUNCTIVE RELIEF

# Exhibit A

–chargepoint

## Exhibit B

### EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT

This Agreement is made by and between the undersigned employee ("Employee") and ChargePoint, Inc., a Delaware corporation (the "Company"), and shall be effective as of the first day of Employee's employment by Company. This Agreement will survive termination of Employee's employment with Company. In consideration of Employee's employment with Company and the compensation now and hereafter paid to Employee by Company, Employee hereby confirms his or her agreement as follows:

I.      General. Employee's employment by Company is in a capacity in which he or she may have access to, or contribute to the production of, Confidential Information and Company Work Product (both as defined below). Employee's employment creates a relationship of confidence and trust between Company and Employee with respect to the Confidential Information and Company Work Product.

II.     Definitions.

A.      "**Confidential Information**" shall mean information or material (i) that is proprietary to Company or considered confidential by Company, whether or not designated or labeled as such, and (ii) that Employee creates, discovers or develops in whole or in part, or of which Employee obtains knowledge of or access to in the course of Employee's relationship with Company. Confidential Information may include, but is not limited to, designs, works of authorship, formulae, ideas, concepts, techniques, inventions, devices, improvements, know-how, methods, processes, drawings, specifications, models, data, diagrams, flow charts, research, procedures, computer programs, marketing techniques and materials, business, marketing, development and product plans, financial information, customer lists and contact information, personnel information, and other confidential business or technical information. For purposes of this Section 2, "Company" shall mean Company or any of its affiliates. INFORMATION THAT IS OR BECOMES PUBLICLY KNOWN WITHOUT FAULT ON EMPLOYEE'S PART SHALL NOT BE SUBJECT TO THE CONFIDENTIALITY OBLIGATIONS SET FORTH IN THIS AGREEMENT.

B.      "**Work Product**" shall mean inventions, data, ideas, designs, drawings, works of authorship, trademarks, service marks, trade names, service names, logos, developments, formulae, concepts, techniques, devices, improvements, know-how, methods, processes, programs and discoveries, whether or not patentable or protectable under applicable copyright or trademark law, or under other similar law, and whether or not reduced to practice or tangible form, together with any improvements thereon or thereto, derivative works therefrom, and intellectual property rights therein.

III.    Confidentiality.

During the term of Employee's employment by Company and at all times thereafter, Employee will keep in strict confidence and trust all Confidential Information, and Employee will not, directly or indirectly, disclose, distribute, sell, transfer, use, lecture upon or publish any Confidential Information without the written consent of Company, except as may be necessary in the ordinary course of performing Employee's duties as an employee of Company.

-chargepoin+

A. Employee recognizes that Company has received and in the future will receive information from third parties which is subject to an obligation on Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes.

Employee agrees, during the term of Employee's employment and thereafter, to hold all such confidential or proprietary information of third parties in the strictest confidence and not to disclose or use it, except as necessary in performing Employee's duties as an employee of Company consistent with Company's agreement with such third party. Employee agrees that such information will be subject to the terms of this Agreement as Confidential Information.

IV. Company Property. All apparatus, computers, computer files and media, notes, data, documents, reference materials, sketches, memoranda, records, drawings, engineering log books, equipment, lab/inventor notebooks, programs, prototypes, samples, equipment, tangible embodiments of information, and other physical property, whether or not pertaining to Confidential Information, furnished to Employee or produced by Employee or others in connection with Employee's employment, shall be and remain the sole property of Company and shall be returned promptly to Company as and when requested by Company. Should Company not so request, Employee shall return and deliver all such property to Company upon termination of Employee's employment. Employee may not retain any such property or any reproduction of such property upon such termination. Employee further agrees that any property situated on Company's premises and owned, leased, maintained or otherwise contracted for by Company, including, but not limited to, computers, computer files, e-mail, voicemail, disks and other electronic storage media, filing cabinets, desks or other work areas, are subject to inspection by Company's representatives at any time with or without notice.

Company Work Product. Employee agrees that any Work Product in whole or in part conceived, developed, made or reduced to practice by Employee (either solely or in conjunction with others) during or after the term of his or her employment with Company that (a) are made through the use of any of Company's trade secrets or other Confidential Information, (b) result from use of any equipment, facilities or supplies owned, leased, maintained or contracted for by Company, (c) relate to or are useful in Company's business, including, but not limited to, Company's design, experimental, production, financing, manufacturing, licensing, distribution or marketing activities, or Company's actual or demonstrably anticipated research and development, or (d) result from any work performed by Employee for Company (collectively, "**Company Work Product**") shall be owned exclusively by Company. Without limiting the foregoing, Employee agrees that any Company Work Product shall be deemed to be "works made for hire" as a matter of law. Employee hereby irrevocably assigns and transfers, and agrees to assign and transfer in the future on Company's request, to Company all right, title and interest in and to any Company Work Product, including, but not limited to, patents, copyrights and other intellectual property rights therein. Employee shall treat any such Company Work Product as Confidential Information of Company. Upon Company's request, Employee will execute all applications, assignments, instruments and other documents and perform all acts as Company or its counsel may deem necessary or desirable to obtain, perfect or enforce any patents, copyright registrations or other protections on such Company Work Product and to otherwise protect the interests of Company therein.

Employee's obligation to assist Company in obtaining and enforcing the intellectual property and other rights in Company Work Product in any and all jurisdictions shall continue beyond the termination of Employee's employment, but, after such termination, Company shall compensate Employee at a rate not to exceed USD$200 per day for time actually spent by Employee on such assistance at Company's request. Employee acknowledges that Company may need to secure

-chargepoint-

Employee's signature for lawful and necessary documents required to apply for, maintain or enforce intellectual property and other rights with respect to Company Work Product (including, but not limited to, renewals, extensions, continuations, divisions or continuations in part of patent applications).

Employee hereby irrevocably designates and appoints Company and its duly authorized officers and agents, as Employee's agents and attorneys-in-fact, to act for and in Employee's behalf and instead of Employee, to execute and file any such document(s) and to do all other lawfully permitted acts to further the prosecution, issuance and enforcement of patents, copyright registrations and other protections on Company Work Product with the same legal force and effect as if executed by Employee. Employee further hereby waives and relinquishes any and all moral rights that Employee may have in the Company Work Product.

V.      Section 2870. This Agreement shall not be interpreted to assign to or vest in Company any of Employee's rights in any Work Product other than as set forth herein and shall be construed in accordance with the applicable provisions of California law. This Agreement does not apply to inventions which qualify fully for protection under California Labor Code Section 2870 ("**Section 2870**"). Employee understands that Employee bears the full burden of proving that the invention qualifies fully under Section 2870.

VI.     Pre-Employment Work Product.

A.      Employee represents and warrants that Exhibit A attached hereto, entitled "List of Work Product" is a true and complete list of all Work Product, if any, whether or not patented or copyrighted and whether or not reduced to practice, that were conceived, made or reduced to practice by Employee (either solely or in conjunction with others) prior to his or her employment by Company and that Employee wishes to exclude from the scope of this Agreement ("**Pre-Employment Work Product**"); provided, however, that any improvements, whether or not reduced to practice, made to or on, or any derivative works made from, any of the listed Work Product after commencement of Employee's employment by Company are subject to the terms of Section 5 hereof. If no such list is attached to this Agreement, Employee represents that no Pre-Employment Work Product exists at the time of signing this Agreement. If, in the course of Employee's employment with Company, Employee incorporates into a product, program, service or process of Company a Pre-Employment Work Product, Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide, transferable and sublicensable license to reproduce, prepare derivative works of, distribute, perform publicly, display publicly, make, have made, modify, use, sell, offer to sell, import and otherwise exploit such Pre-Employment Work Product as part of or in connection with such product, program, service or process. Notwithstanding the foregoing, Employee agrees that it will not use or incorporate any Pre-Employment Work Product in its work for Company without Company's prior written consent. Employee acknowledges and agrees that Company and its subsidiaries or affiliates are free to compete or develop information, inventions, programs, processes, services and products similar to the Pre-Employment Work Product.

B.      Employee acknowledges that Company has a strict policy against using proprietary information belonging to any other person or entity without the express permission of the owner of that information. Employee represents and warrants that Employee's performance of all the terms of the Agreement and as an employee of Company does not and will not result in a breach

-chargepoin+

of any duty owed by Employee to a third party to keep in confidence any information, knowledge or data. Employee has not brought and will not bring to Company, or use, induce Company to use, or disclose in the performance of Employee's duties any equipment, supplies, facility, electronic media, software, trade secret or other information or property of any former employer or any other person or entity, unless Employee has obtained their written authorization for its possession and use.

VII. Records. Employee agrees that he or she will keep and maintain adequate and current written records (in the form of notes, sketches, drawings or such other form(s) as may be specified by Company) of all Company Work Product made by Employee during the term of his or her employment with Company, which records shall be available at all times to Company and shall remain the sole property of Company.

VIII. Presumption. If any application for any United States or foreign patent related to or useful in the business of Company or any customer of Company shall be filed by or for Employee during the period of one (1) year after Employee's employment is terminated, the subject matter covered by such application shall be presumed to have been conceived during Employee's employment with Company.

IX. Agreements with Third Parties or the U.S. Government. Employee acknowledges that Company from time to time may have agreements with other persons or entities, or with the U.S. Government or agencies thereof, which impose obligations or restrictions on Company regarding inventions made during the course of work thereunder or regarding the confidential nature of such work. Employee agrees to be bound by all such obligations and restrictions and to take all action necessary to discharge the obligations of Company thereunder.

X. Injunctive Relief. Because of the unique nature of the Confidential Information and the Company Work Product, Employee understands and agrees that Company will suffer immediate and irreparable harm if Employee fails to comply with any of his or her obligations under this Agreement and that monetary damages will be inadequate to compensate Company for such breach. Accordingly, Employee agrees that in the event of a breach or threatened breach of this Agreement, in addition to any other remedies available to it at law or in equity, Company will be entitled, without posting bond or other security, to injunctive relief to enforce the terms of this Agreement, including, but not limited to, restraining Employee from violating this Agreement or compelling Employee to cease and desist all unauthorized use and disclosure of the Confidential Information and Company Work Product. Employee will indemnify Company against any costs, including, but not limited to, reasonable legal fees and costs, incurred in obtaining relief against Employee's breach of this Agreement. Nothing in this section shall be construed as prohibiting Company from pursuing any other remedies available to it for such breach or threatened breach, including but not limited to recovery of damages.

XI. No Solicitation. Employee agrees that, during the period of his or her employment with Company and for a period of one (1) year following termination of such employment for any reason, Employee will not directly or indirectly (a) hire or recruit any employee or contractor of Company, or solicit or in any manner encourage employees or consultants of Company to end their relationships with Company; or (b) other than on behalf of Company, call on, solicit or take away the business of, or attempt to do any of the same, any customer of Company with whom Employee became acquainted during the course of Employee's employment with Company through use of Confidential Information. Employee acknowledges and agrees that the names, addresses, contact information and product specifications of Company's customers constitute Confidential

8 | P a g e

─chargepoin┼

Information and that the sale or unauthorized use or disclosure of this or any other Confidential Information would constitute unfair competition with Company.

XII.     Conflict of Interest. Employee shall not accept employment or consulting work or enter into a contract or accept an obligation inconsistent or incompatible with its obligations under this Agreement.

XIII.    Disclosure of Obligations. Employee hereby authorizes Company to provide a copy of this Agreement and any exhibits hereto to any of Employee's future employers, and to notify any such future employers of Employee's obligations and Company's rights hereunder.

XIV.     Employment at Will. Employee understands that Employee's employment is "at will" and that Employee or Company may terminate Employee's employment at any time, for any reason, with or without cause and with or without notice, but that Employee's obligations under this Agreement shall survive such termination. Nothing in this Agreement shall confer any right with respect to continuation of Employee's employment by Company, nor shall it interfere in any way with Employee's right or Company's right to terminate Employee's employment at any time.

XV.      Arbitration and Equitable Relief.

A.      **ARBITRATION.** Company and employee each agree that any and all controversies, claims, or disputes between us (including any claims employee has against company and any of its employees, officers, directors or shareholders, in their capacity as such or otherwise, or any benefit plans of company) arising out of, relating to, or resulting from employee's employment with company or the termination of thereof, including but not limited to any breach of this agreement, shall be subject to binding arbitration under the arbitration rules set forth in California Code of Civil Procedure sections 1280 through 1294.2, including section 1283.05 (the "rules") and pursuant to California law. Disputes which employee agrees to arbitrate, and thereby agrees to waive any right to a trial by jury, include any statutory claims under state or federal law, including, but not limited to, claims under title vii of the civil rights act of 1964, the Americans with Disabilities Act of 1990, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the California Fair Employment and Housing act, the California Labor Code, claims of harassment, discrimination or wrongful termination and any statutory claims.

B.      **PROCEDURE.** Each party agrees that any arbitration will be administered by the American Arbitration Association ("**AAA**") and that the arbitrator will be selected in a manner consistent with the AAA national rules for the resolution of employment disputes (the "AAA rules"). Each party agrees that the arbitrator shall have the power to decide any motions brought by any party to the arbitration, including motions for summary judgment and/or adjudication and motions to dismiss and demurrers, prior to any arbitration hearing. Each party also agrees that the arbitrator shall have the power to award any remedies, including attorneys' fees and costs, available under applicable law. Employee understands that company will pay for any administrative, hearing or other fees charged by the arbitrator or AAA unless employee would otherwise be required to pay such fees if employee had filed the claim in the appropriate court. Each party agrees that the arbitrator shall administer and conduct any arbitration in a manner consistent with the rules and that to the extent that the AAA rules conflict with the rules, the rules shall take precedence.

−chargepoin⊢

C. **REMEDY.** Except as provided by the rules, arbitration shall be the sole, exclusive and final remedy for any dispute between employee and company. Accordingly, except as provided for by the rules, neither employee nor company will be permitted to pursue court action regarding claims that are subject to arbitration.

D. **AVAILABILITY OF INJUNCTIVE RELIEF.** In addition to the right under the rules to petition the court for provisional relief, each party agrees that any party may also petition the court for injunctive relief where either party alleges or claims a violation of this agreement or any other agreement regarding trade secrets, confidential information, non-solicitation of employees or Labor Code §2870. In the event either party seeks injunctive relief, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

E. **ADMINISTRATIVE RELIEF.** Employee understands that this agreement does not prohibit employee from pursuing an administrative claim with a local, state or federal administrative body such as the Department of Fair Employment and Housing, the Equal Employment Opportunity Commission or the Workers' Compensation Board. This agreement does, however, preclude employee from pursuing court action regarding any such claim.

XVI. Miscellaneous. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to its conflict of law provisions. This Agreement contains the full and complete understanding of the parties with respect to the subject matter hereof and supersedes all prior representations and understandings, whether oral or written. In the event that any provision hereof or any obligation or grant of rights by Employee hereunder is found invalid or unenforceable pursuant to judicial decree or decision, any such provision, obligation or grant of rights shall be deemed and construed to extend only to the maximum permitted by law, the invalid or unenforceable portions shall be severed, and the remainder of the Agreement shall remain valid and enforceable according to its terms. The Agreement may not be amended, waived or modified, except by an instrument in writing executed by Employee and a duly authorized representative of Company. This Agreement shall be binding upon the heirs, executors and administrators of Employee and will inure to the benefit of Company and its successors and assigns.

XVII. Notices. Any notices required or permitted hereunder shall be given to the appropriate party at the address specified below or at such other address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three (3) days after the date of mailing.

XVIII. Jurisdiction and Venue; Waiver of Jury Trial. Except as expressly provided otherwise herein, Company and Employee each hereby irrevocably (a) submits to the exclusive jurisdiction of, and venue in, the courts of in the State of California and the United States, in each case located in the Northern District of California, and (b) waives any objection that it may have at any time to the laying of venue of such dispute brought in any such court, waives any claim that such dispute has been brought in an inconvenient forum, and waives the right to object, with respect to any such dispute, that such court does not have jurisdiction over such party. In any action or proceeding to enforce rights under this Agreement, the prevailing party shall be entitled to recover costs and reasonable attorneys' fees. Nothing herein shall limit the right of Company to obtain injunctive relief in any jurisdiction for violation of the portions of this Agreement dealing with protection of Confidential Information or Company Work Product.

-chargepoin+

XIX.    Acknowledgment. Employee acknowledges and agrees that employee is executing this agreement voluntarily and without any duress or undue influence by company or anyone else. Employee further acknowledges and agrees that employee has carefully read this agreement and that employee has asked any questions needed for employee to understand the terms, consequences and binding effect of this agreement and fully understand it, including that employee is waiving his or her right to a jury trial.

Finally, employee acknowledges and agrees that he or she has been afforded the right to consult with an attorney of his or her own choosing and, to the extent that employee has not done so; employee has not done so voluntarily and without coercion.

Employee agrees to the terms, and acknowledges receipt of a copy, of this Agreement.

**EMPLOYEE:**

DocuSigned by:

*Overton Claborne*

C224135DF7A14F8...
Overton Claborne                            7/7/2020 | 5:04 PM PDT

**CHARGEPOINT:**

DocuSigned by:

*Kelly M. Adamkiewicz*

5DC8312F4D6D442...
Director, HR & Global Talent                7/7/2020 | 4:55 PM PDT
Kelly M. Adamkiewicz

–chargepoin+

**EXHIBIT A - PROPRIETARY INFORMATION AND INVENTIONS AGREEMENT**

LIST OF PRE-EMPLOYMENT WORK PRODUCT

This List of Pre-Employment Work Product, along with any attached pages, is part of and incorporated by reference into the attached EMPLOYEE CONFIDENTIALITY AND INVENTIONS AGREEMENT (the "**Agreement**").

The following is a complete list of all Work Product which Employee made or conceived or first reduced to practice alone or jointly with others prior to Employee's employment by Company (collectively, "**Pre-Employment Work Product**"). Employee understands that Company will not require Employee to assign any rights Employee may have in any of the listed Pre-Employment Work Product, except any license granted under the Agreement. Employee further understands that the listed Pre-Employment Work Product will not be classified as Confidential Information or Work Product assigned to Company pursuant to Section 5. Employee represents that this list of Pre-Employment Work Product is complete.

_____ No Pre-Employment Work Product to report.

_____ See below.

_____ Additional sheets attached.

DocuSigned by:

*Overton Claborne*
Overton Claborne
C224135DE7A14F8

7/7/2020 | 5:04 PM PDT

# Exhibit B

# MUTUAL NONDISCLOSURE AGREEMENT

THIS MUTUAL NONDISCLOSURE AGREEMENT (this "Agreement") is entered into and effective as of the date of the last signature below (the "Effective Date"), between _Overton Instruments_ ("Company"), with an address at _125 Serra Way Milpitas CA_ and ChargePoint, Inc., a Delaware Corporation and its Affiliates (collectively, 'ChargePoint") as defined below, with an address at 254 East Hacienda Avenue, Campbell, CA 95008. Company and ChargePoint are each sometimes referred to in this Agreement as, a "Party," and collectively as, the "Parties."

**1.    Confidential Information.** "Confidential Information" means confidential or proprietary information disclosed or made available by one Party to the other, including but not limited to, business plans, financial reports, financial data, employee data, customer lists, designs, specifications, drawings, diagrams, computer code and programs, trade secrets, discoveries, ideas, concepts, know-how, techniques, and other technical and business information. Confidential Information may be that of the disclosing Party or of third parties to whom the disclosing Party has an obligation to treat the disclosed information as confidential. Confidential Information also includes copies, notes, abstracts and other tangible embodiments made by the receiving Party that are based on or contain any of such information, as well as the existence and progress of the Purpose (described in Section 4 below). For purposes of this Agreement, "Affiliates" shall mean any entity which directly or indirectly controls, is controlled by, or is under common control with the subject entity. "Control", for purposes of this definition, means direct or indirect ownership or control of fifty percent (50%) or more of the voting interests of the subject entity.

**2.    Identification of Confidential Information.** Information will be considered to be Confidential Information and protected under this Agreement if it is identified as "confidential" or "proprietary" at the time of disclosure or if the information should reasonably be considered to be confidential or proprietary due to its nature or the context of its disclosure.

**3.    Protection of Confidential Information.** Each Party acknowledges that the other Party claims that its Confidential Information is a valuable and unique asset and agrees to the following:

(a)    The receiving Party: (i) will not disclose the Confidential Information to any third party; (ii) will not disclose the Confidential Information to its employees or agents unless the employees or agents have a need to know the Confidential Information for the Purpose; (iii) will use the Confidential Information only for the Purpose and will not use it for its own or for any third Party's benefit; and (iv) will not create any type of derivative works based on the Confidential Information, copy, frame, replicate or mirror any part or content of the Confidential Information, or reverse engineer any of the Confidential Information or products received or disclosed during the Effective Date. The receiving Party may not access or use the Confidential Information for any improper purpose whatsoever, including, without limitation, in order to (A) build a competitive product or service, or (B) copy any features, functions, interface, graphics or "look and feel" of the disclosing Party's product or Confidential Information. The receiving Party shall promptly notify the disclosing Party of any unauthorized use or disclosure, or suspected unauthorized use or disclosure, of the disclosing Party's Confidential Information of which the receiving Party becomes aware. The receiving Party shall be responsible to the disclosing Party for any disclosure of Confidential Information by any employee or agent of the receiving Party.

(b)    The receiving Party will use the same degree of care to protect the Confidential Information from unauthorized use or disclosure as it would use to protect its own information of a similar nature, but in no event with less than reasonable care.

(c)    The receiving Party's obligations under this Agreement with respect to particular information do not apply to the extent that: (i) the disclosing Party authorizes the receiving Party in writing to disclose such information; (ii) the receiving Party knows such information at the time of disclosure by the disclosing Party, free of any obligation to keep it confidential, as evidenced by written records; (iii) such information is or becomes generally known in the relevant industry without fault of the receiving Party; (iv) the receiving Party independently develops

such information without access to or use of the Confidential Information, as evidenced by written records; or (v) the receiving Party rightfully obtains such information from a third Party who has the right to disclose it without violation of any confidentiality obligations. However, even if certain information is already known, the disclosing Party's use of it (including the fact of the Party's use and the manner and results of use) may not be and thus would be considered to be Confidential Information.

(d)    If the receiving Party is subject to judicial or governmental proceedings requiring disclosure of particular Confidential Information, then, prior to disclosing any such Confidential Information, the receiving Party will provide the disclosing Party with reasonable prior notice and will obtain, or provide the disclosing Party with an opportunity to obtain, a protective order or confidential treatment of the Confidential Information.

**4.    Purpose.** Confidential Information of each Party may only be used to evaluate possible business opportunities between the parties (the "Purpose").

**5.    Return of Confidential Information.** All Confidential Information of the disclosing Party remains the property of that Party and will be returned to it or destroyed at its request or upon the termination or other expiration of this Agreement. Within 30 days of receiving such a request from the disclosing Party, the receiving Party will comply with the request and provide a written certification, signed by an officer, of its compliance. Notwithstanding the foregoing, Parties are not required to delete copies that are maintained pursuant to automatic back-up and archiving systems provided that confidential obligations shall remain on those archived copies.

**6.    No License or Warranty.** No license under any patents, copyrights, mask work rights, trademarks or other proprietary rights is granted by the disclosure of or access to Confidential Information under this Agreement. ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS", WITHOUT ANY EXPRESS OR IMPLIED WARRANTIES, INCLUDING BUT NOT LIMITED TO A WARRANTY THAT IT IS ACCURATE OR COMPLETE OR A WARRANTY AGAINST INFRINGEMENT.

**7.    No Inducement or Commitment.** Each Party will determine in its sole discretion the information to be disclosed to the other Party. Neither the disclosure nor access to Confidential Information under this Agreement constitutes an inducement or commitment to enter into any business relationship. If the parties desire to pursue business opportunities, the parties will execute a separate written agreement with respect to such opportunities.

**8.    Term & Termination.** This Agreement will be effective from the Effective Date and will continue until written notice of termination is provided by either Party to the other. All provisions of this Agreement relating to Confidential Information disclosed pursuant to this Agreement prior to termination will survive.

**9.    Assignment & Binding Effect.** Neither Party may assign this Agreement without the other Party's prior written consent, except that no such consent is needed in the event of a Party's assignment or transfer of the majority of its stock or all or substantially all of its assets to which the Purpose relates, as part of a merger, acquisition or asset sale. Any assignment in violation of this Agreement will be void. This Agreement benefits and binds the parties to this Agreement and their respective successors and permitted assigns.

**10.    Jurisdiction & Venue.** This Agreement will be governed by and construed in accordance with the laws of the State of California,

exclusive of its choice of law principles. The state and federal courts located in Santa Clara County, California have exclusive jurisdiction and venue over any dispute arising out of or relating to this Agreement. Each Party consents to the personal jurisdiction and venue of these courts.

**11. Entire Agreement.** This Agreement contains the entire understanding, and supersedes any and all prior and contemporaneous agreements (oral or written), between the parties regarding this Agreement's subject matter. This Agreement will not be modified, and no provision will be waived, except by a writing that both parties sign. A Party's failure to require performance will not affect the right to require performance at any later time. If any part of this Agreement is unenforceable, the rest will remain in effect.

**12. Authority.** Each Party represents that it has full power and authority to enter into and perform this Agreement, and the person signing this Agreement on behalf of each Party has been properly authorized and empowered to enter this Agreement, understands it, and agrees to be bound by it.

**13. General.** Each Party will comply with all applicable export control laws, rules and regulations. Any notice under this Agreement, if sent to the Party entitled to such notice at the address set forth below, will be deemed to have been provided 3 days after the notice is sent by certified mail (postage prepaid), or the next business day if the notice is sent by national overnight service.

Company: Overton Instruments (OI)

Signature:

By: Overton Claborne Sr

Title: Owner/Manager

Date: 5/28/2020

Overton Instruments (OI)

~~155 Milpitas Ct #5035~~°C

105 Sarra Way #105

Milpitas CA 95035

(510) 944-4377

**ChargePoint, Inc.**

DocuSigned by:

Signature: Rachel Larrenaga

By: Rachel Larrenaga — AFF6891A823A458...

Title: Vice President, Legal

Date: 5/28/2020